May it please the Court, and thank you, Your Honors. My name is Roman Rector, and I represent the Petitioner-Appellant in this matter, Son Nguyen. I would like to reserve two minutes for rebuttal. Would you close the doors, please? I'd like to reserve two minutes for rebuttal. Unlike the previous case, my client was there at the scene and fully confessed to being there. He was definitely a part of this horrific crime, and he witnessed it with his own eyes. The questions before Your Honors today is, did my client receive a fair trial, and were his due process rights violated during his trial? And the questions before Your Honor today are, did the State Appellate Court unreasonably reject Mr. Nguyen's claim that, one, the trial court admission of prejudicial and irrelevant gang evidence denied his right to due process in a fair trial? Two, was the trial court's denial of Petitioner's motion to sever his trial from that of his co-defendants denying his right to due process, a fair trial, his right to present a defense, and his right to the presumption of innocence? And third, did the trial court's rulings regarding the additional courtroom security measures, extreme additional courtroom security measures, deny Petitioner's right to due process in a fair trial and his right to a public trial? And the fourth and final issue, did the district court err in concluding that the cumulative effect of the trial court's ruling on the above-stated issues did not violate its appellant's rights to due process in a fair trial? And with that opening, Your Honor, I will open it up to questions from the bench. Why don't you discuss the Bruton error issue first, if you don't mind? The Bruton error, it's a severance issue. And my client, as I stated to Your Honor previously, fully confessed to being there and being a part of the crime. And when he did so, he gave a statement to the police, a very long statement. They questioned him at length. The murder occurred about two months previously, and he walked in with his father to the San Jose Police Department and confessed I was there. So they interrogated him at length. During this interrogation, he made certain statements regarding a co-defendant. In other words, a co-defendant had threatened him. He wasn't part of either gang. There was no testimony really provided, although there was a lot of error of gang evidence. He was not part of either gang. And essentially, he did not know his co-defendants very well. I think he went along with the right to impress a girl, to kind of, you know, be a tough guy and be there. When he got to the Maytian Cafe and was out in the parking lot, his co-defendant, he finally found out why they were there, to go avenge the shooting of the gang leader of the ABs, Mr. Doe. He finally found out why they were there. And while sitting in the parking lot before they went into the cafe, he realized that there was going to be a shooting. And his co-defendant said, now you better go in there and you better shoot whoever you see. The person who made that statement to him was a gang member, and he was fearful of them. The issue then regarding the redacted statement, the issue regarding the redacted statement then comes into play. I'm sorry, Your Honor. When the statement could not be used because the co-defendant would have a right to confront their accusers, therefore they redacted the statement of the specific defendant who said, hey, you better go in there and shoot whoever. They redacted that statement down to, they threatened me. So the defendant, Mr. Nguyen, was not allowed at trial to fully bring the statement in that he was threatened. And thus it goes to intent. My client was not found to have shot anyone. Ballistics shows that my client, none of the bullets hit my client. I'm sorry, none of my client's bullets hit anybody. They didn't kill anybody. So thus he was convicted of murder two as an aider and a better. Right. So how did the brutineer prejudice you? I guess this is what I was getting to. Given the jury verdict, or the alleged brutineer, I should say, the state will jump up and objectify, categorize it as error. I mean, he's convicted of second-degree murder. I took the Thresher argument to mean that if he had a separate trial, you could have fully explored the statement. But the statement only went to intent. That is correct, Your Honor. Had he had a severance and a separate trial, the statement would have gone to intent. In other words, the statement was this. The redacted statement was Khan, the co-defendant, threatened him. That he was first aware of the shooting when Khan told him about it. So in an ATM parking lot. And Khan threatened the appellate in the parking lot and said, you better shoot whoever. These were very specific threats. But if your client had been convicted of first-degree murder, I think your argument would be better. But since he was convicted, not convicted of first-degree murder, how can you show prejudice from the alleged error? Well, we can show prejudice. Well, the whole issue then comes in of this imperfect duress argument. It was originally – I didn't write the original brief in this argument. But it was argued at trial and argued in the brief that there would be an imperfect duress argument. In other words, he was prejudiced because he could not bring out this imperfect duress argument. And there is – without the creation of new law, I don't believe there's an imperfect duress argument in this case. But what there is is it goes to intent. It goes to his intent. Because he was convicted of second-degree murder and because he was not found to be a principal, he had to be convicted of aiding and abetting. And to be convicted of aiding and abetting, you have to have an intent at some point. And the three prongs of the intent to be found as an aid or abetter, he or she must act with, A, knowledge of unlawful purpose of the perpetrator, B, the intent or purpose of committing, encouraging, or facilitating the commission of offense, and C, by acts or aids, promotes, encourages, or instigates the commission of the crime. The intent here – he never formed the requisite intent because of the threat. He never had the intent. Well, but that evidence was put before the jury by the statement that did come in. Yes, they threatened him. And you think it would have been materially different if the portion – the actual words that Conn said were put before the jury? I think so, Your Honor. I mean, when somebody – Where's the threat? When somebody threatens you, when somebody does a threat, it would have been more believable to the jury because of this. When somebody gives you a specific threat, I will be – Well, what's the specific threat? Well, there was a – Wait, time out. You asked for questions. I'm trying to get one out. Yes, Your Honor. I'm looking at the transcript. You said – and you paraphrased it or read it. This is when he realized it was going to be an incident, a shooting. What did Conn say? He told me, shoot whoever you see. There's no threat in that, necessarily. Without calling it a threat, that's just a written statement. So reading that's a neutral statement. So it would have required testimony to flesh it out, correct? He said a minute ago he just said Conn said you better shoot. Did he say that or not? He said you better shoot whoever you see. So now you've got you better shoot however you see. And unless there's a statement attached to that by your client either characterizing his understanding of that as a threat or something else, it doesn't necessarily resonate as a threat. It's arguably a threat. But what did come in, and which the California court seized upon, is that they threatened me. He got a nice, clean statement. No basis for the kind of nitpicking I'm going through, which the prosecutor would have done. And he got a clean statement that he was threatened. So I'm not even sure where the violation is in the first place. And under AEDPA, how can we say that the California Supreme Court of Appeal violated a clearly established Supreme Court law? Well, as to the first part of your question, Your Honor. That was a compound question, but I was trying to get it all right. Yeah. No, I understand. Lawyers tend to talk very quickly. As to the first part of the statement, there was the general statement, as Your Honor quoted, they, quote, threatened me. I guess you have to see it in the context of who you're dealing with. You know, there's different kinds of threats. There's direct threats, veiled threats. He's sitting next to a known gang member in the back of a car, and his other gang buddies have a bunch of guns, shotguns, .22s, .38s. Was that evidence in front of the jury? It was, yeah. But the general threat of, quote, they threatened me is it's always more conceivable when you have the specifics of a threat. You know, when somebody says, you know, I will be at your house tomorrow to beat you up instead of just I'm going to come get you. I will be there tomorrow. And was there a specific threat? But it's the connotation. You have this gang member who looks at him and says, you better go in there and shoot whoever. And the connotation is if you don't, we're going to do something about it. We're going to do, me and my gang buddies are going to do, you better go in there and shoot whoever you see. And there's that connotation that if you don't, you're going to be the next victim. Well, I'm still coming back to my question, which is under the Ed Code restrictive standards, can you persuade us that there's reason to say that this is a fairly established or an unreasonable application? Well, Your Honor, the case that I'm bringing this under would be Zaffero v. United States, which is 506 U.S. 534. And what the court is saying there is in deciding whether to separately try joint defendants, the court must consider, quote, whether there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. So that is the legal standard. That is the Supreme Court law under the Ed Code standard would be Zaffero. The severance issue, I personally don't believe it is the strongest part of this case. I mean, the great amount of gang evidence and the courtroom security issues. Now let's talk about the courtroom security. Yeah. Kind of a tough argument to make after Atlanta that the defendant has a right to relax security, isn't it? Well, I don't think so. You know, the courtroom security, there's a number of measures. There's a courtroom. And just to get in like any other courtroom, there is an X-ray machine and a metal detector. Okay, well, then you go up to the floor where there's these four courtrooms. And there's these four courtrooms with different trials going on. Okay, and there's no additional security for three of those courtrooms. But for this courtroom, for our defendants, there is a bailiff or two standing outside. The bailiff submits every person going into the courtroom to wanting. Then they then check the purses. Then they then check their IDs. Then they put their names and addresses on another list and then go check to see if those persons have outstanding warrants. People who are there to see the defense or who are associated with the defense sit on the right. People associated with the victim sit on the left. There are no persons sitting in the front row. Defendants are given two-inch pencils with which to write their notes. How much of this was exposed to the jury? All of it. The jury walked by. And with each recess, Your Honor, with every recess, the entire courtroom, everybody had to leave. And then to go back in, everybody had to go through the same procedures. The jury walked right past these procedures and went into another door. So for weeks on end, the jury saw everybody who goes into the courtroom had to be submitted to these extra security procedures. And the defendants have to write with two-inch pencils. And the message to the jury for this many-week trial is these are some dangerous guys. That, coupled with the gang evidence that comes in, I think severely prejudice the defendant, especially a defendant who is not a gang member. And should he have had a severance, my guy was not the one who was causing these extra courtroom security measures. There's a 21-page document declaration under seal which said whatever, you know, the reason for the threat is there's a threat. And the judge allowed all these extra courtroom security measures. But my guy was not the reason for these measures. And had he had a severance, he wouldn't have had the jury wouldn't have had to have seen them. But I think a jury— I think he would have gotten something less, yes. I don't know. A manslaughter? I would love to make that argument, but maybe not. You know, I don't know what they would have gotten. But there's no doubt that a jury watching this extreme procedure go on day after day. Up to six times a day, the courtroom would be vacated, and the people would go in and go through wanting and searching of the portions. Granted, this isn't going on any other way. I understand, but you started out conceding that your guy was there. He got the gun. I mean, he's a nice guy, but he went out and got his newly acquired major pistol and brings it along and shoots. And what—I mean, what in the hell margin? It goes to intent. It goes to his intent. You have to have a requisite intent to be found guilty of— Let me play out your argument here. Basically, your theory that you're expounding today is your guy was there. He shot, but he was so scared of these other guys that—and he was threatened, so he had to do it. Why doesn't that courtroom security help you? These guys are dangerous guys. They've got two-inch pencils. Because my—well, I guess so they can't stab anybody in the neck with the pencil. Your argument is that—your argument is that they were so dangerous that your client was threatened and doing something he didn't want to do. How does the extra courtroom security harm that argument? Because I think the—my guys lumped in with these guys. My guys lumped in— They discriminated between your guy and his co-defendant. I'm sorry, Your Honor? They discriminated in their verdict between your guy and the co-defendant. Didn't the co-defendant get first degree? There were five co-defendants. They were all—okay. Three got first degree. My guy got second degree, and one got a mistrial. Okay. And one got a mistrial. So, but your—aside from not getting a mistrial, your guy came out better than the three really bad guys. That is correct, Your Honor. Your time has expired. Thank you, counsel. Thank you. Good morning again. I'm Morris Bates for the appellate and respondent. The question raised—or the questions raised by the court a number of times is what has always struck me. Why didn't the jury come back with a first degree murder in this case? That has always been a surprise to me. The fact that it came back with a second degree murder is even more surprising. The— You expected a request? No. I'm not sure I understand. I misstated my brilliant comment. The point is it's surprising that the jury came back with second degree in the face of the fact that the defendant admitted to going to this café and firing at hopeless victims who were shot to death. The question then is what—with respect to the severance issue, what would have benefited the defendant by redacting, by not—or not redacting the statement that he claimed was made to him by one of the co-defendants? The only theory that some—the defendant advances is that the joint trial caused a redaction of the statement that threatened him in the parking lot before he shot the three victims. The state court, again, in our view, reasonably concluded that he benefited from that redaction. Comments that this court made, I think, confirm that reasonable application and determination of what the law is. The statement was made by an unarmed participant co-defendant, an unarmed co-defendant, to the appellant here, Sohn, who was armed, who had a Browning semi-automatic. And the words were, you better shoot whoever you see. Because that comment was redacted, the defense attorney could argue that Sohn was in fear of his life, and that's why he helped slaughter three men. There's no question that they were aiding and abetting. There's no question that there's a co-conspiracy. There's no question that a jury would have come back with a verdict, at least a second degree. If this had not been redacted, the reasonable inference would be the jury would have come back with first degree, because this does not establish that he was in danger. No reasonable jury, I believe, and certainly a court, a reasonable court, could not infer that a jury would believe that this comment would suggest that Sohn was in danger and acted because of that. With respect to the, I think, more demanding question about the courtroom security that was employed, the first issue that comes up is to public closure and whether there was public closure. There is no evidence whatever that a single individual was barred from entering the court and seeing this trial. This court was Broome, and this trial was not closed by any presentation of evidence to the public. The only question, then, is whether security measures, which were neutral, caused the jury to believe that the defendant was somehow guilty of the charged offense, somehow was inferred that the defendant was violent in some way and, therefore, was guilty of the charged offense.  The fact of the matter is that the security measures were neutral. They did not focus on the defendant's culpability of dangerousness. There was no shackling. There was nothing that would suggest to the jury that any one of those jurors, that any one of those defendants was in any way responsible or associated with the need for the security measures. The fact is you're making me nervous. Your lens dropped out. I've done that on mine. Pick it up so you don't step on it. I do that all the time. It usually falls out. What about the 2-inch pencil? And I don't know how long this is. I think 3, but I didn't. Is that a security measure, the 2-inch pencil? Or is that just a courtroom economy? I don't know, Judge. I don't think it reflects shackling. I don't think it just reflects a general sense of security. This is a case in which there were, or this particular trial involved five defendants, three victims. There were a lot of people who showed up on behalf of the defendants, who were associated with the defendants, and a lot of people showed up who were associated with the victims. The security measures were there to protect the court or the participants in this trial from visitors, not from the defendants. The security measures were directed to people who came into the courtroom, not for those who were sitting there and participating in the trial. The fact of the matter is that the security measures suggested probably to the jurors that there might be danger from the victim families, from the people who were entering the court to see why or how or what happened in connection with this charged offense. The terror, I think, that may have been inferred was what might happen because of the victim families or the people associated with those victims. I gather there was no explanation by the court for the increased measures, right? There was not. But there was nothing in the nature of these neutral security measures that would allow any rational, reasonable juror to infer that any defendant was responsible for the need for this security. Well, I think that's a bit of an overstatement to say that they wouldn't or that they couldn't. They could have. It is your argument that they might have assigned, different jurors might have assigned blame or concern to one source or another. But to think that jurors aren't influenced by high-level security, maybe in today's world it might be viewed as routine. But certainly at the time of this trial, I don't think the mindset of the jury would comfortably be said to draw no inference whatsoever and speculate as to who is responsible. Isn't that the risk? There is. Without explanation to the jury, they're free to speculate on any of these options. And the risk is they speculate against the defendants. There is a risk that a jury may speculate as to any matter. But the point is that as a practical, as a determination, as a ruling based on reasonable application of established law, the State court concluded that there was no basis for determining or for concluding that the jury was adversely affected by these neutral. That's a different issue. I cannot say what a jury actually thought. And I don't believe anyone can. But we do know what the Supreme Court has said about security measures. And in Holbrook v. Flynn, the Supreme Court noted that with regard to appearance of the courtroom guard that they, quote, could easily believe, that is the jurors, that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that the tense courtroom exchanges do not erupt into violence. So the inference can go any way, but there's certainly nothing to suggest that the jury inferred adversely to the defendants. And, again, given the nature of the facts surrounding the crime in this case and someone's involvement in the crime, there was no prejudice whatever. That is imaginable. Thank you. Thank you, counsel. Your Honor, I would just like to point out that when this case was before the Sixth District Court of Appeal, the Sixth District did find a due process violation that stated that it was harmless error. And when this case was before the District Court for the Northern District of California, that court also found a due process violation and also claimed that it was a trial error and subject to the harmless error evaluation of Chapman v. California. So the test then becomes, you know, a federal court can find a constitutional error under the Chapman standard harmless if the court can declare that the error was harmless error beyond a reasonable doubt. And I would submit to you that we cannot say that this was harmless error beyond a reasonable doubt. Due process and the right to a fair trial, these confidential reports, and this is related to the confidential report, without Mr. Wynn having notice and an opportunity to be heard regarding the security measures, the judge did not allow them an opportunity to suggest less restrictive measures because they didn't know what the violation or what the security concern was. And while we briefly touched on it, Your Honor, I would just like to note that I did submit to the court about a week or two ago the Ninth Circuit's decision in Kennedy v. Locke here. It is Judge Reinhart's decision. And while we touched upon the gang evidence, Mr. Reinhart or Judge Reinhart, and I'll just quote this briefly on page 1055 of the Kennedy decision, states that evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error. Well, let's not take those out of context. I was on that panel, too, and I know the context of that case. And that was where a prosecutor had introduced very severe gang evidence and did it over a prior court's ruling in the first trial, but that was highly prejudicial. So don't push broad statements too far. Thank you, Your Honor. Thank you very much for your arguments.
judges: Noonan, Thomas, Fisher